WICK, by guardian *ad litem*, Respondent, vs. WICK, Appellant.

*February 8—March 8, 1927.*

*Parent and child: Action in tort by child against parent: Public policy.*

On grounds founded in a wholesome public policy, it is *held* that a child under the age of fourteen cannot maintain an action in tort against its parent for personal injury sustained by the child in an automobile accident due to the negligence of the parent. CROWNHART, J., dissents.

APPEAL from an order of the circuit court for Kenosha county: E. B. BELDEN, Circuit Judge. *Reversed.*

For the appellant there was a brief by *Whaley, Erikson & Paulsen* of Racine, attorneys, and *Hannan, Johnson & Goldschmidt* of Milwaukee, of counsel, and oral argument by *Martin R. Paulsen* and *Vilas H. Whaley.*

For the respondent the cause was submitted on the brief of *A. C. McHenry,* attorney, and *Roy S. Stephenson,* of counsel, both of Kenosha.

OWEN, J. This is an action brought against the defendant by his infant child, under the age of fourteen years, to recover damages for personal injuries sustained by the plaint-

iff as a result of an automobile accident due to the negligence
of the defendant. A demurrer to the complaint was over-
ruled, and the appeal from the order overruling the demurrer
presents the question of whether an infant child may main-
tain an action in tort against its parent.

It is conceded that English decisions afford no precedent
for this action. It has often been said that this fact affords
strong ground for the belief that no such action was main-
tainable at common law. Judge Cooley, writing in the 70s,
in the second edition of his work on Torts, at p. 197, *171,
said:

"In principle there seems to be no reason why such an ac-
tion should not be sustained; but the policy of permitting
actions that thus invite the child to contest the parent's au-
thority is so questionable that we may well doubt if the right
will ever be sanctioned."

No case involving this question appears to have come be-
fore any appellate court in England or America prior to
1891. In that year the Mississippi court considered the ques-
tion in *Hewlett v. George,* 68 Miss. 703, 9 South. 885, where
it was held that such an action cannot be maintained. That
decision has been followed in Tennessee, Washington, Min-
nesota, North Carolina, Indiana, Rhode Island, and New
Jersey. *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S. W.
664; *Roller v. Roller,* 37 Wash. 242, 79 Pac. 788; *Taubert
v. Taubert,* 103 Minn. 247, 114 N. W. 763; *Small v. Mor-
rison,* 185 N. C. 577, 118 S. E. 12; *Smith v. Smith,* 81 Ind.
App. 566, 142 N. E. 128; *Matarese v. Matarese* (R. I.) 131
Atl. 198; *Mannion v. Mannion* (N. J.) 129 Atl. 431. The
only discordant note in the otherwise judicial harmony upon
this question is that of the dissenting opinion of CLARK,
C. J., who dissents in the case of *Small v. Morrison,* 185
N. C. 577, 118 S. E. 12. The case of *Clasen v. Pruhs,*
69 Neb. 278, 95 N. W. 640, is cited in opposition to this
rule. But that was not a case in which the child sued its

natural parent.   In that case the action was brought against an aunt with whom the child was temporarily living.

The reasons in support of this doctrine may be summarized as follows: The family is a social unit.   The members thereof are of the same blood.   They are bound together by the strongest natural ties.   Naturally, mutual love and affection obtains between the members thereof.   There is mutual interest in one another's welfare.   The family fireside is a place of repose and happiness.   Society takes its caste from the character of its homes.   It has a deep interest in maintaining in its integrity and stability the natural conception of the family unit.   This imputes authority to the parent and requires obedience of the child.   To question the authority of the parent or to encourage the disobedience of the child is to impair the peace and happiness of the family and undermine the wholesome influence of the home.   To permit a child to maintain an action in tort against the parent is to introduce discord and contention where the laws of nature have established peace and obedience.   Natural instinct condemns such proceedings as most unseemly, and the laws of society will not, to the detriment of society, defeat the benign influence of the laws of nature.   That public policy which looks to the public welfare will not encourage discord and rebellion in the family unit and thus destroy that wholesome influence of the home in molding the character of our future citizens.   Generally speaking, filial affection is ample protection to the child from excessive punishment at the hands of the parent, but where the authority of the parent is abused in the way of excessive or brutal punishment a child will be protected through the criminal laws of the state.   True, this does not redress the child for permanent injuries which thus may be inflicted.   But it is deemed better public policy that occasional injuries of this kind go unrequited rather than encourage or tolerate proceedings so repugnant to natural sentiments concerning family relations.   We find ourselves

thoroughly in accord with courts holding that an action of this kind cannot be maintained and indorse the doctrine as one founded in a most wise and wholesome public policy.

It is suggested that a contrary conclusion is made necessary in this state by our decision in *Wait v. Pierce,* 191 Wis. 202, 209 N. W. 475, 210 N. W. 822.   But the decision in that case does not reach the question here under consideration.   That case touched only one aspect of the family relation, namely, that of husband and wife:   While it may be conceded, and perhaps is to be regretted, that the decision of that case (made necessary by statute) mars somewhat the symmetry and beauty of the family conception, it does not destroy it, and this court is not disposed to impair it further than is necessary to carry out apparent legislative policies.

Neither does this case conflict with nor affect the doctrine of *Steber v. Norris,* 188 Wis. 366, 206 N. W. 173, where it was held that one standing *in loco parentis* is liable to the child for excessive punishment.   In all such cases the family relation, which is the foundation of the public policy governing the disposition of this case, does not obtain.

*By the Court.*——Order reversed, and cause remanded with instructions to sustain the demurrer.

CROWNHART, J. (*dissenting*).   The court holds that a child under custody of the parent may not sue the parent for injuries or wrongs committed by the parent resulting in damages.   Art. I, sec. 9, of the Wisconsin constitution provides:

"Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws."

This provision of the constitution declares a public policy of the state, and courts are not at liberty to disregard it and

substitute their own ideas of what public policy should be. This provision has been held to be mandatory as to property. *Janesville v. Carpenter,* 77 Wis. 288, 301, 46 N. W. 128.

It is conceded that in principle there is no reason in the common law why an infant may not sue a parent. The maxim of the common law is: *Ubi jus ibi remedium,*—there is no wrong without a remedy. No court at common law has ever held that an infant is without a remedy in case of injury to his person through the negligence of the parent or any other person. Indeed, there is no doubt that the infant may sue the parent to preserve its property rights. The court now declares a public policy that forbids an infant from suing for wrongs inflicted upon the infant by the parent. But courts may not make public policy contrary to the organic law of the land. The constitutional provision quoted is as broad and comprehensive as the English language is capable of expressing. It is as inclusive as to injuries or wrongs to the person as it is to property or character.

The opinion of the court is put squarely on the ground of public policy, now for the first time judicially declared. The court sees dangers to the family life, the social unity of the family, and denies the infant the right to sue the parent for tort solely on that ground. But is there any more danger of disrupting the family life by permitting an infant to sue for injury to his person than for injury to his property rights? At common law an infant could sue the parent to maintain his property rights. An infant's personal rights are as sacred as his property rights. Why not the same rule as to injuries to his person as to his property? The constitution classifies the rights together and on an equality.

Courts may prophesy, but the practice often leads them to embarrassment. In 1875 this court, in an opinion by its then great Chief Justice, denied women the right to practice law, on the ground of public policy. In language which now

seems most extravagant it was predicted that permission to practice law would work the gravest injury to women and to their social and moral relations.  And yet, at the 1878 session of the legislature a law was enacted providing that the right to admission to the bar should not be denied on account of sex, and the lady formerly denied admission was thereupon duly admitted by this court.  See *In re Goodell,* 39 Wis. 232, 48 Wis. 693, 81 N. W. 551.  The prophecies of this court did not materialize.  Women have not disgraced themselves or the profession as lawyers.  The social relations have not been unduly disturbed.

In 1890 this court denied a married woman the right to sue for alienation of the affections of her husband.  *Duffies v. Duffies,* 76 Wis. 374, 45 N. W. 522, Mr. Justice CASSODAY dissenting.  The court prophesied that if such actions were permissible they "would be numberless."  That case came up for review in 1903, in *Lonstorf v. Lonstorf,* 118 Wis. 159, 95 N. W. 961.  By this time the position of the court had been reduced to the principle of *stare decisis,* with Justices CASSODAY and SIEBECKER dissenting.  In 1905 the legislature gave a married woman the express right to sue for alienation of the husband's affection, and there has not resulted the numberless actions predicted by the court in the *Duffies Case.*

Every step taken to emancipate women from the rigorous restrictions of the common law has been met with dark forebodings on the part of the judiciary.  But now that women have been put on a parity with men as to their personal and property rights, society survives, with none of the dark portends of the judicial prophets realized.

In order to give women their natural rights they had to be emancipated from the restrictions of the common law.  Not so with children.  The common law always regarded children as under its special protection.  Mr. Chief Justice

CLARK demonstrates this statement in his dissenting opinion in *Small v. Morrison,* 185 N. C. 577, 118 S. E. 12, 31 A. L. R. 1135.   He said:

"In the English Reports it is said: 'It is essential for the protection of infants that suits on their behalf should not be discouraged.'   Sir JOHN LEACH, V. C., in *Stevens v. Stevens,* 6 Madd. Ch. 97, 56 Eng. Reprint, 1028.   In 2 Reeves, English Law, 180, it is said, referring to chapter 15, Westminster II, in the reign of Edward I, providing that infants could maintain an action by a next friend, 'This statute has always been construed as giving permission in all cases for infants to appear by their next friend, which, however, is nothing more than a confirmation of the common law.'

"From the above statements of the leading English authorities as to the common law, it will be seen that no judge in England has ever at any time held that a child could not maintain an action against its father, and that at common law such actions have been maintained not only in respect to dealing with the child's property, but in actions for slander and libel (Eversley, Domestic Relations, 554, 555) ; and, as we have adopted the common law, our courts have no authority to change it unless it has become obsolete or contrary to the humanity of the age."

This court, in the instant case, admits that in principle the common law gives an infant the right to sue a parent in tort. That being so, the right is preserved by our constitution. Art. XIV, sec. 13; art. I, sec. 9.

I come to the question of public policy.   The opinion of the court presents this question in a very lucid and interesting discussion.   Yet, I think the reasons given are quite inconsistent with the logic of the law.   The law, without doubt, is that an infant may sue the parent, in debt; may bring action against the parent to recover real estate; may have an accounting against the parent to require the parent to account for trust funds held by the parent as trustee for the infant; and other similar actions affecting property rights, and in none of these matters does public policy say "Nay" to the infant.   Are property rights, strictly speaking, of more importance to the infant than the rights of person?   In the

Bill of Rights they are put on a par. "Every person [an infant is a person] is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property, or character." Is the infant to be given the right to sue the parent for damages resulting from the negligence of the parent in the loss of the infant's property, and denied the right to sue for damages resulting from the loss of a leg through the negligence of the parent? The reason that justifies the one and denies the other is metaphysical and not founded in justice. It exalts property above physical condition to enjoy property. Dr. Pound, in his Spirit of the Common Law, p. 189, says:

"Recent legislation and judicial decision have changed the old attitude of the law with respect to dependent members of the household. Courts no longer make the natural rights of parents with respect to children the chief basis of their decisions. The individual interest of parents, which used to be the one thing regarded, has come to be almost the last thing regarded as compared with the interest of the child and the interest of society. In other words, social interests are now chiefly regarded."

The court hesitates because of lack of precedent. The common law followed principle and made precedents to conform to principle. Jenk. Cent. 117. It is said in Broom's Legal Maxims (9th ed.) p. 132:

"It is, however, important to observe this distinction, that, where cases are new in principle, it is necessary to have recourse to legislative interposition in order to remedy the grievance; but where the case is only new in the instance, and the sole question is upon the application of a principle recognized in the law to such new case, it will be just as competent to courts of justice to apply the principle to any case that may arise two centuries hence as it was two centuries ago."

This court, with slow and halting step, has finally given to women full emancipation from the restrictions of the common law (*Wait v. Pierce*, 191 Wis. 202, 209 N. W. 475, 210 N. W. 822), but now, it seems to me, it deprives infants of the rights sustained and upheld by the principle of the

common law and guaranteed to them by the solemn mandate of our constitution.

That the courts may, in the absence of statutory or constitutional provisions, declare public policy, I agree; but when the constitution declares a right, that is the public policy of the state and no court can justly ignore or disobey it.

The courts which have held that an infant may not sue a parent have all put their decisions on the ground of public policy. None have discussed constitutional provisions such as we have in Wisconsin, and such decisions are therefore not authority for a Wisconsin court.

I agree with the trial court in his ruling where he said:

"Times, social conditions and views have substantially changed since the rules of law and of public policy relied on in support of the demurrer were established. I appreciate no valid reason, considering modern tendencies, other than adherence to ancient precedents, why one spouse may not sue the other, or a child a parent, for injuries proximately resulting from such other's neglect. That such action might disturb 'cherished concepts relating to the unity of the family and the sanctity of the family relation' or have long been considered contrary to public policy, is overridden by modern concepts of individual rights and remedies."

Times have changed. Practically no business is now carried on without insurance to protect the owner against his negligence whereby his employees may be damaged. Practically all owners of automobiles protect themselves in the same way. Certainly all prudent men should guard against liability in such cases. Should a man think less of his own flesh and blood than of his employees or the stranger on the highway? And if he is thoughtful enough to insure against misfortune due to his negligence to the public at large, must the court step in and deny the infant member of his family the same chance in life as is possessed by the public? I think not.